IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 7, 2016

**STATE OF TENNESSEE v. JOHNNY WILKERSON**

**Appeal from the Criminal Court for Shelby County**
**No. 14-03148     W. Mark Ward, Judge**
_____

**No. W2016-00078-CCA-R3-CD  -  Filed November 7, 2016**
_____

A Shelby County jury found the Defendant, Johnny Wilkerson, guilty of two counts of aggravated robbery, and the trial court sentenced him to consecutive sentences of twenty years for each conviction.  On appeal, the Petitioner asserts that the evidence is insufficient to support his convictions.  After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Barry W. Kuhn (on appeal) and Amy G. Mayne (at trial), Memphis, Tennessee, for the appellant, Johnny Wilkerson.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Amy P. Weirich, District Attorney General; and Ann L. Schiller, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

Margaret Robinson and Jason Eschhofen were robbed at gunpoint as they left Ms. Robinson's apartment on January 24, 2014.  For his role in the incident, a Shelby County grand jury indicted the Defendant for two counts of aggravated robbery.  At trial, the parties presented the following evidence: Ms. Robinson testified that her apartment was located near the University of Memphis campus in Memphis, Tennessee.  In the early evening hours of January 24, 2014, she and her boyfriend, Jason Eschhofen, were leaving her apartment when an "average-sized African American man" approached them in a

"hurried fashion." Ms. Robinson did not take much notice of the man until he pointed a small black gun at the couple and ordered them to sit on the ground between two cars. The man demanded Ms. Robinson's and Mr. Eschhofen's wallets and cell phones. The couple complied with these demands, and the man threatened to kill them if they moved.

Ms. Robinson testified that, upon seeing the small black gun, she was "terrified" that she was going to die and also going to watch Mr. Eschhofen be killed. She further described the perpetrator as wearing a gray and white striped hoodie. After taking the victims' wallets and cell phones, the man again threatened the couple saying, "[I]f you move I will shoot you." Ms. Robinson recalled being fearful that the perpetrator was waiting nearby to shoot the couple once they got up from between the cars. Ms. Robinson surveyed the ground underneath the nearby cars and, when she did not see anyone, the couple got up quickly and ran to the apartment complex. One of Ms. Robinson's neighbors was leaving at the time, and Mr. Eschhofen used the neighbor's cell phone to notify police.

Ms. Robinson testified that she was "in shock" following the incident and felt "very shaky." She cried hysterically and contacted her mother to cancel her credit cards while Mr. Eschhofen spoke with the police on the cell phone. Ms. Robinson said that she had $10 in cash and credit cards in her wallet at the time it was stolen. The perpetrator also took her blue Samsung phone, which police later returned to her in working condition.

The night of the incident, Ms. Robinson provided police officers with a description of the robber, and the following day, she viewed a photographic lineup at the police station. Ms. Robinson was unable to identify the robber in the first lineup or a second lineup shown to her several days later. On January 29, 2014, Ms. Robinson returned to the police station to view a third photographic lineup and "pretty quickly" identified the robber.

After Ms. Robinson identified the robber, a police officer returned her cell phone and wallet to her. The wallet contained "the beginning of one of [her] credit cards" and her driver's license. Several months later, Ms. Robinson testified at a preliminary hearing in this case and, during the hearing, identified the Defendant as the robber. She further identified the Defendant in court during the trial as the man who had taken her wallet and cell phone on January 24, 2014.

On cross-examination, Ms. Robinson testified that, during the incident, the robber wore the hoodie over his head covering his hair. She stated that she tried to look at his face but was more focused on the gun he held. She estimated that the entire encounter lasted about thirty seconds and said that it was nighttime. She described there being one

light in the parking lot, and it was not near where she and Mr. Eschhofen were ordered to sit between cars.

Jason Eschhofen's testifimony about the robbery was consistent with Ms. Robinson's testimony. Mr. Eschhofen testified that he was "very scared" during the encounter but compliant with the robber's demands due to concern for their safety. Mr. Eschhofen gave the robber his cell phone and wallet that contained identification cards, credit cards, and $40 to $50 in cash. Mr. Eschhofen confirmed that he spoke with the police on the telephone about the robbery and provided their location. When the police arrived, five to ten minutes later, Mr. Eschhofen provided a statement about the robbery and a description of the robber. Mr. Eschhofen described the robber as a "lighter skinned" African American wearing a hoodie with black horizontal stripes.

Mr. Eschhofen testified that he checked his bank records online in the hours following the robbery and learned that one of his "cards" was used at a nearby gas station within half an hour of the robbery. Mr. Eschhofen also viewed all three photographic lineups and identified the robber in the third photographic lineup on January 29, 2014. About the third photographic lineup, Mr. Eschhofen recalled that his identification was "not immediate." He said that he quickly narrowed it down to two individuals and then asked a police officer for a larger photograph of "number one." He said that he requested the larger photograph to see the "structure directly relating to his shoulders . . . and neck . . . to see it in context of more of the physical . . . size of him." Upon viewing the larger photograph, Mr. Eschhofen "immediately" recognized the photograph as the robber because of the "size of his shoulders in relation to his head . . . his facial structure and the way his jaw line and cheeks were shaped."

Mr. Eschhofen testified that he never recovered his cell phone. He did, however, recover his wallet with the cards inside but without the cash. Mr. Eschhofen also identified the Defendant as the robber during the preliminary hearing for these charges and at trial.

Douglas Gailey, a Memphis Police Department ("MPD") officer, reported to the robbery scene on January 24, 2014 between 9:00 and 10:00 p.m. He spoke with the victims who stated that they were exiting an apartment and walking to a car when a black male approached, pulled a pistol, and demanded their money and cell phones. The man ordered the two victims onto the ground and then left. Officer Gailey described both victims as nervous and Ms. Robinson as "real scared," "shaking," and "crying." While at the scene, Mr. Eschhofen advised Officer Gailey that his online bank records indicated his bank card was used at the Shell Station located at Highland and Summer. Officers were dispatched to the location, but no suspect was found.

3

Jerry Capps, a MPD detective, testified that, after speaking with the victims, he attempted to retrieve surveillance footage from the Shell gas station at Highland but learned that the security system had been "down" so no footage could be obtained. He also looked for security cameras in the area that might have recorded the suspect but was unable to locate any surveillance footage. Next, Detective Capps contacted the victims seeking to obtain information from the stolen phones. The victims provided several phone numbers that Detective Capps researched and found two possible suspects. Based upon these two potential suspects, Detective Capps created a photographic lineup. The lineup was shown to both victims and neither identified the robber in the lineup.

Detective Capps testified that a University of Memphis police officer contacted him and provided another phone number. The phone number was from Ms. Robinson's cell phone records and indicated that her stolen cell phone had exchanged text messages with the provided phone number. The phone number was associated with Tiffany Allen. Police officers spoke with Ms. Allen at her residence, and she consented to a search of the house. Inside the house, police officers found Ms. Robinson's cell phone. Ms. Allen told the police officers that her boyfriend, Corey Durham, had been sending her text messages from the cell phone. Mr. Durham was arrested for possession of stolen property.

Detective Capps created another photographic lineup with a picture of Mr. Durham and showed it to both victims. Neither victim identified Mr. Durham as the robber. During an interview, Mr. Durham stated that he had bought Ms. Robinson's phone from his friend, the Defendant, who lived across the street. A third photographic lineup, which included a photograph of the Defendant, was created and shown to the victims. Both victims identified the Defendant as the perpetrator of the January 24 offenses. The Defendant's roommate notified the police that he had located a gun. Officers reported to the residence and found a small, black, toy pistol in the residence and the victims' wallets inside a garbage can located on the curb in front of the residence.

On cross-examination, Detective Capps agreed that Corey Durham had a prior aggravated robbery charge and also met the victims' description of the robber. He confirmed that the victims did not identify Mr. Durham as the robber in the second photographic lineup.

Shawn Hicks, a MPD sergeant, testified that he interviewed Corey Durham while he was in custody as a suspect. Initially, Mr. Durham denied any knowledge of the robbery, saying he bought the cellphone "off the street" for $10. Sergeant Hicks did not believe Mr. Durham because Mr. Durham matched the description provided by the victims of the robbery. Sergeant Hicks told Mr. Durham that he did not believe his story and, after a few minutes, Mr. Durham "broke down and started crying." Mr. Durham told

4

Sergeant Hicks that he had bought the phone from his neighbor, the Defendant, who lived across the street. Mr. Durham was released from custody and the following day, officers were sent to locate the Defendant.

Sergeant Hicks testified that, while officers were searching for the Defendant, Mr. Durham's girlfriend, Tiffany Allen, called the police station and stated that she had seen the Defendant place some of the victims' property in his garbage can. Tiffany Allen was present during Mr. Durham's arrest and aware of the police investigation. Sergeant Hicks advised the officers looking for the Defendant of this additional information, and the officers found the Defendant at his residence. The officers also found some of the stolen items in the Defendant's garbage can outside his residence. Later, the victims identified the recovered items as the stolen property.

Sergeant Hicks testified that he created a photographic lineup including a photograph of the Defendant and showed it to the victims. Both of the victims identified the Defendant as the perpetrator of the robbery. After the victims identified the Defendant, Sergeant Hicks spoke with the Defendant, who denied any participation in the robbery. The Defendant told Sergeant Hicks that Mr. Durham approached him about possibly buying the phones. The Defendant said that as he looked at the phones, he saw pictures of "white people," realized the phones were stolen, and declined buying either phone. Based upon the identifications and the recovery of the stolen items from the Defendant's residence, the Defendant was arrested. Sergeant Hicks turned the Defendant over to a transport officer who escorted the Defendant to jail. Shortly after the Defendant and the officer left, Sergeant Hicks received a call from the transport officer, saying the Defendant had asked to speak with Sergeant Hicks.

Sergeant Hicks testified that he met with the Defendant in the intake area of the jail. The Defendant told Sergeant Hicks that he was with Mr. Durham during the robbery, describing the location of the robbery. He explained that he waited in the car while Mr. Durham "did the robbery" and then returned to the car with the stolen property. The Defendant denied knowing that Mr. Durham was going to rob anyone but realized what had occurred when Mr. Durham returned to the car with "some phones." The Defendant told Sergeant Hicks that, following the robbery, he tried to help Mr. Durham sell the phones.

On cross-examination, Sergeant Hicks confirmed that Mr. Durham had a prior conviction for carjacking. He further confirmed that the gun reported by the Defendant's roommate was recovered from underneath the refrigerator in the Defendant's residence.

Corey Durham testified that he had a prior aggravated robbery conviction that he had pleaded guilty to almost thirteen years before. He denied any involvement in the

5

current robbery. He explained that he became involved in this case because he bought a cell phone from the Defendant. Mr. Durham and the Defendant were neighbors, and the Defendant had come by to buy marijuana. The Defendant showed Mr. Durham the phones, and Mr. Durham could not afford the "black LG" so he purchased "the blue phone" for $10.00. Mr. Durham said that he was aware the cell phones were stolen because the Defendant stated that he had taken the phones from someone along with the credit cards.

Mr. Durham testified that he first lied to the police because he did not want "to get in trouble about the phone." But eventually, Mr. Durham told the police that he had purchased the phone from the Defendant, and he was released. Mr. Durham said that he also told the police that, after he purchased the blue phone, the Defendant went to "Head's house" to try and sell the black LG phone.

Tiffany Allen testified that in January 2014, she and Corey Durham lived together with her daughter. She recalled a day when police came to the residence, and she gave consent for the police officers to search the residence. The police found a cell phone, and Ms. Allen advised the police that Mr. Durham had been using the cell phone. Ms. Allen was taken into custody but released late that night. Several days later, a man who she knew as "Yo," came to her residence one morning and told her that he had seen the Defendant throw "the stuff" in the trash. He suggested that Ms. Allen notify police, and she did so. Within a short time after she called, she observed the police knocking on the Defendant's door. Ms. Allen stated that she was not concerned that Mr. Durham would be charged with the robbery because he had told her that he had bought the phone.

The State re-called Ms. Robinson and Mr. Eschhofen and both confirmed their certainty about their identification of the Defendant as the perpetrator.

The Defendant testified that Mr. Durham and Ms. Allen were his neighbors and that Mr. Durham would drive him to work. The Defendant denied involvement in the January 24, 2014 robbery. According to the Defendant, one day he noticed that Mr. Durham had a new phone and commented on it. Mr. Durham's previous phone had broken, and he told the Defendant that he found the new phone at a gas station located on Summer and Highland. The Defendant considered Mr. Durham a friend, so he warned Durham that he "better hope, you know, no one reports the phone stolen, you know, or lost or whatever." Mr. Durham responded to the Defendant, saying he was not concerned about that, and the Defendant "left it alone."

The Defendant testified that several days later, he was standing in his driveway when the police arrived at Mr. Durham's house, and the Defendant watched the police take Mr. Durham away. Late that night, Mr. Durham came to the Defendant's house.

6

The Defendant asked Mr. Durham what happened, and he said that the police arrested him for having the phone but released him. Mr. Durham then asked the Defendant if he knew where Mr. Durham might purchase some marijuana, and the Defendant told Mr. Durham he did not. Mr. Durham left, and the following morning, the police arrived at the Defendant's residence and arrested him. At the police station he was questioned, and he denied placing the stolen items in the garbage can. The Defendant said that he had put his garbage can out the night before. As to the plastic gun that the police officers found in the Defendant's residence, the Defendant speculated that it might have belonged to his son, who had recently visited.

The Defendant denied telling Sergeant Hicks anything other than that he was not involved in a robbery. He maintained that Sergeant Hicks, Ms. Robinson, Mr. Eschhofen, Mr. Durham, and Ms. Allen were all lying. The Defendant agreed that he had been convicted of two drug-related offenses and a domestic battery offense.

Based upon this evidence, the jury convicted the Defendant of two counts of aggravated robbery, and the trial court sentenced the Defendant to consecutive sentences of twenty years for each conviction. It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant asserts that the evidence is insufficient to support his convictions because the State failed to prove identity. The State responds that the State produced sufficient evidence to prove that the Defendant committed theft of property from Ms. Robinson and Mr. Eschoffen by placing them in fear with an item fashioned to be a deadly weapon. We agree with the State.

We first acknowledge the State's argument that the Defendant failed to timely file a notice of appeal and, therefore, we should dismiss the appeal. The Defendant concedes that he failed to timely file his motion for new trial thereby causing his notice of appeal to be delayed. He, however, asks that this Court to review this sufficiency challenge in the interest of justice pursuant to Tennessee Rules of Appellate Procedure, Rule 13(b). In the interest of justice, we choose to review the Defendant's assertion that the conviction evidence was insufficient.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*,

91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), superseded by statute on other grounds as stated in *State v. Barone*, 852 S.W.2d 216, 218 (Tenn.1993)) (quotations omitted). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of

guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

A conviction for aggravated robbery, as relevant to this case, requires proof beyond a reasonable doubt that the Defendant committed an "intentional or knowing theft of property from the person of another by violence or putting the person in fear" and that the robbery was "accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. §§ 39-13-401(a), -402(a)(1) (2014).

The evidence, viewed in the light most favorable to the State, shows that the Defendant approached the victims as they left Ms. Robinson's apartment on the night of January 24, 2014. He ordered the victims to the ground at gunpoint and demanded they give him their wallets and cell phones. After receiving the items, the Defendant threatened to kill the victims if they moved, and he fled the scene. The Defendant then attempted to sell both of the cell phones and to use Mr. Eschhofen's credit card before disposing of the victims' property in his garbage can. Ms. Robinson's cell phone was found in Mr. Durham's possession. Mr. Durham testified that he had purchased the phone from the Defendant. A gun matching the description provided by the victims was found under the refrigerator in the Defendant's residence, and the victims' personal items were found discarded in the Defendant's trash can. Both victims viewed three separate photographic lineups. Only the third photographic lineup contained a photograph of the Defendant, and the victims identified the Defendant in the third photographic lineup as the perpetrator. We conclude that this is sufficient evidence upon which a jury could reasonably conclude that the Defendant committed these offenses.

As to the Defendant's argument concerning identity, we acknowledge that the identity of a perpetrator is an essential element of any crime. *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975). Issues regarding identity, however, are questions of fact to be determined by the jury. *State v. Vaughn*, 29 S.W.3d 33, 40 (Tenn. Crim. App. 1998). Any conflicts in witness testimony regarding the identity of the accused and the weight to be afforded the testimony are issues resolved by the jury. *State v. Anderson*, 880 S.W.2d 720, 726 (Tenn. Crim. App. 1994). By its verdict, the jury accredited the victims' testimony and this Court does not second-guess the weight, value, or credibility afforded to the evidence by the jury.

Accordingly, we conclude that the State presented sufficient evidence of identity to support the Defendant's convictions. Therefore, the Defendant is not entitled to relief on this issue.

9

## III. Conclusion

After a thorough review of the record and relevant authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE